No. 22-55415

_____

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

_____

M.A.R., et al.,

Plaintiffs – Appellants,

v.

CITY OF LOS ANGELES, et al.,

Defendants - Appellees,

_____

On Appeal from the United States District Court
for the Central District of California
Hon. Fred W. Slaughter, Presiding
United States District Court No. D.C. No. 21-cv-02957 FWS (MAR)

_____

# APPELLEES' ANSWERING BRIEF

_____

James R. Touchstone (SBN 184584)
Denise L. Rocawich (SBN232792)
JONES & MAYER
3777 N. Harbor Blvd.
Fullerton, California 92835
Telephone: (714) 446-1400
Facsimile: (714) 446-1448
Attorneys for Defendants-Appellees
Beckstrom, Romero,
Lopez and Moser

# TABLE OF CONTENTS

I.     INTRODUCTION ...................................................................................1

II.    JURISDICTIONAL STATEMENT ......................................................2

       A.    Specific Conditions Must Be Met for A Voluntary Dismissal of
             Claims Wihtout Prejudice to Create a Final Appealable Judgment......2

       B.    Because the Conditions For Finality Are Not Met Here, This Court
             Lacks Jurisdiction to Entertain This Appeal .........................................3

III.   ISSUES PRESENTED FOR REVIEW ..................................................7

       1.    Qualified Immunity Prong 1 – Reasonableness of the Force ...............7

       2.    Qualified Immunity Prong 2 – Clearly Established Law ......................8

       3.    Fourteenth Amendment Claims ............................................................8

IV.    STATEMENT OF THE CASE ...............................................................9

       A.    Summary of Relevant Facts ..................................................................9

       B.    Procedural History and the Challenged District Court Order .............14

V.     SUMMARY OF ARGUMENT ..............................................................17

VI.    STANDARD OF REVIEW AND QUALIFIED IMMUNITY
       STANDARD ......................................................................................... 18

       A.    Standard of Review ............................................................................18

       B.    Qualified Immunity Legal Standards ..................................................19

VII.   LEGAL ARGUMENT ..........................................................................24

A.  The District Court Correctly Determined that the Controlling Force and Allowing Decedent to Roll Into a Prone Position Was Reasonable as a Matter of Law Under the First Prong of the Qualified Immunity Analysis ........................................................................................26

    1.  The Controlling Force Used by the Officers Was Reasonable as a Matter of Law ...........................................................................28

    2.  Allowing Decedent to Roll Into a Prone Position Was Reasonable as a Matter of Law ...................................................33

B.  The District Court Correctly Determined that the Officers Did Not Violate Clearly Established Law With Their Use of Controlling Force, Use of the TASER or in Allowing Decedent to Roll Into a Prone Position ........................................................................................35

    1.  The District Court Correctly Determined that the Officers Did Not Violate Clearly Established Law With Thgeir Use of Controlling Force ...................................................................36

    2.  The District Court Correctly Determined that the Officers Did Not Violate Clearly Established Law With Their Use of the TASER ..................................................................................37

    3.  The District Court Correctly Determined that the Officers Did Not Violate Clearly Established Law By Allowing Decedent to Roll Into a Prone Position ........................................................40

C.  The District Court Correctly Determined that the Officers Were Entitled to Summary Judgment As to Appellant's Fourteenth Amedment Claims ..............................................................................41

D.  Violations of LAPD Policy Are Not Dispositive Evaluating Whether a Force Used Was Reasonable or Whether the Law Was Clearly Established ................................................................................42

VIII. CONCLUSION ........................................................................................44

STATEMENT OF RELATED CASE ...................................................................45

CERTIFICATE OF COMPLIANCE ....................................................................45

CERTIFICATE OF SERVICE .................................................................................46

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

Adonican v. City of Los Angeles,
   297 F.3d 1106 (9th Cir. 2002) .............................................................................7

Anderson v. Liberty Lobby,
   477 U.S. 242 (1986)...........................................................................................19

Ashcroft v. al-Kidd,
   563 U.S. 731, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011) ...............................20

Baker v. McCollan,
   443 U.S. 137, 99 S. Ct. 2689, 61 L. Ed. 2d 433 (1979) .....................................43

Barry v. Fowler,
   902 F.2d 770 (9th Cir. 1990) .............................................................................42

Billington v. Smith,
   292 F.3d 1177 (9th Cir. 2002) *abrogated on other grounds by*
   County of Los Angeles v. Mendez, ___U.S.___, 137 S. Ct. 1539,
   198 L. Ed. 2d 52 (2017).....................................................................................43

Bonivert v. City of Clarkston,
   883 F.3d 865 (9th Cir. 2018) .................................................................37, 39, 40

Boyd v. Benton County,
   374 F.3d 773 (9th Cir. 2004) .............................................................................18

Brosseau v. Haugen,
   543 U.S. 194, 125 S. Ct. 596 .............................................................................20

Broussard v. Violet,
   1989 U.S. Dist. LEXIS 17428 (C.D. Cal. July 24, 1989)...................................42

Chew v. Gates,
   27 F.3d 1432 (9th Cir. 1994) .............................................................................27

City & County of San Francisco v. Sheehan,
   135 S. Ct. 1765, 191 L. Ed. 2d 856 (2015)..........................................................43

City of Escondido v. Emmons,
   139 S. Ct. 500 (2019)........................................................................................36

City of Tahlequah v. Bond,
   142 S. Ct. 9, 211 L. Ed. 2d 170 (2021)............................................................23

Clement v. Gomez,
   298 F.3d 898 (9th Cir. 2002) ...........................................................................19

Dannenberg v. Software Toolworks,
   16 F.3d 1073 (9th Cir. 1994) .........................................................................5, 6

Davis v. City of Las Vegas,
   478 F.3d 1048 (9th Cir. 2007) .........................................................................29

Delia v. City of Rialto,
   621 F.3d 1069 (9th Cir. 2010) ...................................................................19, 26

Drummond ex rel. Drummond v. City of Anaheim,
   343 F.3d 1052 (9th Cir. 2003) ...................................................................*passim*

Dunn v. Castro,
   621 F.3d 1196 (9th Cir. 2010) .........................................................................19

Elder v. Holloway,
   510 U.S. 510, 114 S.Ct. 1019 (1994)..............................................................18

Galvin v. Hay,
   374 F.3d 739 (9th Cir. 2004) ...........................................................................18

Garlick v. County of Kern,
   167 F.Supp. 3d 1117 (E.D. Cal. 2016) ............................................................33

Gasho v. United States,
   39 F.3d 1420 (9th Cir. 1994) .....................................................................20, 41

Gausvik v. Perez,
   392 F.3d 1006 (9th Cir. 2004) .........................................................................41

Graham v. Connor,
        490 U.S. 386, 109 S. Ct. 1865 .........................................................22, 26, 27, 28

Harlow v. Fitzgerald,
        457 U.S. 800, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982) .............................23, 24

Hovater v. Robinson,
        1 F.3d 1063 (10th Cir. 1993) ..............................................................................42

Hyde v. City of Willcox,
        23 F.4th 863 (9th Cir. 2022) ...............................................................................37

In Jones v. Las Vegas Metro. Police Dep't,
        873 F.3d 1123 (9th Cir. 2017) .............................................................................37

James v. Price Stern Sloan, Inc.,
        283 F.3d 1064 (9th Cir. 2002) ......................................................................2, 3, 6

Jones v. Blanas,
        393 F.3d 918 (9th Cir. 2004) .................................................................................6

Kisela v. Hughes,
        138 S. Ct. 1148, 200 L. Ed. 2d 449 (2018)................................................*passim*

Estate of Lopez v. Gelhaus,
        871 F.3d 998 (9th Cir. 2017) ...............................................................................19

Marquez v. City of Phoenix,
        693 F.3d 1167 (9th Cir. 2012) .............................................................................28

Mattos v. Agarano,
        661 F.3d 433 (9th Cir. 2011) .........................................................37, 38, 39, 40

McCue v. City of Bangor,
        838 F.3d 55 (1st Cir. 2016)..................................................................................36

Merrit v. Cnty. of L.A.,
        875 F.2d 765 (9th Cir. 1989) .................................................................................6

Noel v. Hall,
        341 F.3d 1148 (9th Cir. 2003) ...............................................................................4

Policeman's Benev. Ass'n of N.J. v. Washington Tp.,
    850 F.2d 133 (3rd Cir. 1988) ..............................................................24

Pratt v. Gamboa,
    2020 U.S. Dist. LEXIS 87109 (N.D. Cal. May 15, 2020)....................................6

Riccio v. Cty. of Fairfax,
    907 F.2d 1459 (4th Cir. 1990) ............................................................42

Rosenbaum v. Washoe Cty.,
    663 F.3d 1071 (9th Cir. 2011) ............................................................18

Saucier v. Katz,
    533 U.S. 194, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001) .................................35

Schwarz v. Lassen Cty. ex rel. Lassen Cty. Jail,
    628 F. App'x 527 (9th Cir. 2016)........................................................41

Scott v. Harris,
    550 U.S. 372, 127 S.Ct. 1769 (2007)...............................................18, 27

Sims v. Ulit,
    2012 U.S. Dist. LEXIS 11068 (E.D. Cal. Jan. 31, 2012) ..................................42

Smith v. City of Hemet,
    394 F.3d 689 (9th Cir. 2005) .............................................................27

Smith v. Freland,
    954 F.2d 343 (6th Cir. 1992) .............................................................25

Sneller v. City of Bainbridge Island,
    606 F.3d 636 (9th Cir. 2010) ....................................................2, 4, 5, 6

Sorrells v. McKee,
    290 F.3d 965 (9th Cir. 2002) .............................................................41

Tatum v. City & Cty. of S.F.,
    441 F.3d 1090 (9th Cir. 2006) .......................................................34, 40

Tennessee v. Garner,
    471 U.S. 1, 105 S. Ct. 1694, 85 L. Ed. 2d 1 (1985)...................................22, 26

Villarimo v. Aloha Island Air, Inc.,
    281 F. 3d 1054 (9th Cir. 2002) ..........................................................19

White v. Pauly,
    580 U. S. 73, 137 S. Ct. 548, 196 L. Ed. 2d 463 (January 9, 2017)
    (per curiam)......................................................................20, 21, 22

**State Cases**

Christal v. Police Com. of San Francisco,
    33 Cal. App. 2d 564 (Cal. App. 1939)...............................................24

Norgart v. Upjohn Co.,
    21 Cal.4th 383 (1999) .........................................................................6

People v. Garcia,
    62 Cal. 4th 1116 (Cal. 2016) ...........................................................31

People v. Gauze,
    15 Cal. 3d 709 (Cal. 1975).................................................................31

**Federal Statutes**

28 U.S.C. § 1291 ...................................................................................2, 5

42 U.S.C. § 1983 ................................................................................*passim*

**State Statutes**

Penal Code § 459 ........................................................................30, 31, 32

**Rules**

Federal Rule of Civil Procedure 41(a)(2) ...................................................4

Federal Rule of Civil Procedure 54 ........................................................4, 5

Federal Rules of Appellate Procedure, Rule 32(a)(7) ..............................45

Rule 15(c).....................................................................................................6

Rule 28-2.6..................................................................................................45

Rule 54(b)......................................................................................................7

**Constitutional Provisions**

4th Amendment.........................................................................................3, 15

14th Amendment.......................................................................................3, 15

# I.    <u>INTRODUCTION</u>

On August 14, 2020, Los Angeles Police Department Officers Beckstrom, Romero, Lopez and Moser (hereinafter "the Officers" or "Appellees") arrested Daniel Rivera (hereinafter "Decedent"), who had been reported in multiple 911 calls as a suspect of attempted residential burglaries. During the arrest, Decedent fled from the Officers jumping a fence to do so, then actively struggled with the Officers ignoring repeated and numerous Officer commands. After controlling force and application of a TASER in stun-drive mode, Decedent was eventually taken into custody. Unfortunately, Decedent when into distress after being handcuffed and died.

Appellants' claims relate to allegations that Decedent was killed through the use of excessive force by the Officers. The district court granted summary judgment for the Officers on Appellants' Fourth Amendment excessive force claims as well as Appellants' related claim under the Fourteenth Amendment for familial association. The district court's decision was correct in every aspect and should be affirmed.

## II. JURISDICTIONAL STATEMENT

Per the Order of this Court issued July 1, 2022 [DKT 10], the parties were "directed to address the basis for this court's jurisdiction over this appeal." Appellees contend that this Court lacks jurisdiction for the following reasons.

### A. Specific Conditions Must Be Met For A Voluntary Dismissal of Claims Without Prejudice to Create a Final Appealable Judgment

This Court has jurisdiction over the final decisions of the district courts under 28 U.S.C. § 1291. "Ordinarily, a voluntary dismissal without prejudice is not an appealable final judgment." Sneller v. City of Bainbridge Island, 606 F.3d 636, 638 (9th Cir. 2010) *citing* Concha v. London, 62 F.3d 1493, 1507 (9th Cir. 1995).

A party's voluntary dismissal of claims without prejudice can result in a final, appealable judgment if two conditions are satisfied – absence of manipulation and meaningful court participation. James v. Price Stern Sloan, Inc., 283 F.3d 1064, 1066 (9th Cir. 2002); see also Sneller, 606 F.3d at 638. Accordingly, voluntary dismissal of claims without prejudice ***sometimes*** creates a final appealable judgment, but only if those two conditions are met. They are not met in this case.

**B.**     **Because the Conditions For Finality Are Not Met Here,**

**This Court Lacks Jurisdiction to Entertain This Appeal**

Though it is possible that a voluntary dismissal of claims without prejudice can create finality, the conditions under which such a dismissal results in a final appealable judgment are not present here. Specifically, though the Officers admit that the district court "meaningfully participated" in the dismissal, the Officers contend that there is not an "absence of manipulation" as is also required. See James, 283 F.3d at 1066. In other words, this Court lacks jurisdiction to entertain this appeal at this time.

Here, the operative complaint stated seven claims against the Officers for (1) Violation of 42 U.S.C. § 1983 (4th Amendment); (2) Violation of 42 U.S.C. § 1983 (14th Amendment); (3) Violation of 42 U.S.C. § 1983 (Monell liability); (4) Violation of 42 U.S.C. § 1983 (14th Amendment Familial Association) ["collectively the Federal Claims"]; (5) Wrongful Death; (6) Assault and Battery; and (7) Negligence [collectively "the State Law Claims"]. 6-ER-1267-96. As discussed in further detail below, the Officers' Motion for Summary Judgment ("MSJ) was granted as to the Claims 1, 2 and 4 of the Federal Claims. 1-ER-0058. Claim 3 -- the Monell Claim -- was not addressed by the MSJ. Id. The district court severed the

State Law Claims and denied the MSJ as to the State Law Claims without prejudice. 1-ER-0012 at FN. 8.

Thereafter, the Officers filed a Motion to Dismiss the <u>Monell</u> claim and the State Law Claims without prejudice pursuant to Federal Rule of Civil Procedure 41(a)(2). 2-ER-49-56. The district court granted the Motion, thereby dismissing the <u>Monell</u> claim and the State Law Claims without prejudice. 2-ER-27-33. In doing so, the district court specifically declined to enter judgment pursuant to Federal Rule of Civil Procedure 54 stating: "'Because there is no document labeled 'judgment' in this case and no decree entered by the court and because a voluntary dismissal without prejudice is ordinarily not an appealable order, there is no judgment in this case for purposes of Rule 54.'" 2-ER-33 at fn. 5 *citing* <u>Physician's Surrogacy, Inc. v. German</u>, 311 F. Supp. 3d 1190, 1194 (S.D. Cal. 2018).

Appellants argue that under <u>Sneller</u>, supra, the dismissal without prejudice created finality, even in light of Appellants' refiling the State Law Claims in state court, because both <u>Sneller</u> and other Ninth Circuit case law contemplates "overlapping or even identical federal and state court litigation." <u>See</u> Appellants' Opening Brief at p. 34 *citing* <u>Sneller</u>, supra and <u>Noel v. Hall</u>, 341 F.3d 1148, 1159 (9th Cir. 2003). The Officers do not disagree with that premise. However, <u>Sneller</u> is inapposite to the issue at hand because in <u>Sneller</u>, the remaining claims that were

-4-

voluntarily dismissed without prejudice were *solely* state law claims. Indeed, as quoted by Appellants, in <u>Sneller</u> "the remaining claims are state law claims and that any future suit will be in state court, appears legitimate." <u>Sneller</u>, 606 F.3d at 638. Here, the remaining claims that were voluntarily dismissed without prejudice include a federal claim – the <u>Monell</u> claim. Thus, "any future suit" here will not necessarily be confined to state court, but rather could be revived in the district court. For this reason, the dismissal evidences manipulation to create appellate jurisdiction.

Generally, a party impermissibly "manipulates" appellate jurisdiction by simultaneously pursuing an appeal and keeping unadjudicated claims "on hold." <u>See</u> <u>Dannenberg v. Software Toolworks</u>, 16 F.3d 1073, 1077 (9th Cir. 1994). In <u>Dannenberg</u>, the Ninth Circuit held that it did not have jurisdiction under Section 1291 over an order granting partial summary judgment where the parties stipulated to the dismissal of the surviving claims without prejudice, observing that "in essence, the claims [that had been dismissed without prejudice] remained in the district court pending a decision by this court." <u>Id.</u> at 1077. The <u>Dannenberg</u> court then concluded that "litigants should not be able to avoid the final judgment rule without fully relinquishing the ability to further litigate unresolved claims." <u>Id.</u> at 1077. That is exactly what Appellants seek in the case at hand. Here, Appellants have not "fully relinquished" the <u>Monell</u> claim. They did not dismiss the <u>Monell</u> claim ***with***

prejudice and the district court declined to enter judgment under Rule 54; thus, there can be no finality as there remains an unresolved federal claim stated against all Defendants including the Officers. See 6-ER-1285. In short, Dannenberg rather than Sneller is applicable.

In that same vein, Appellants' arguments under James, supra and Jones v. Blanas, 393 F.3d 918, 927 (9ᵗʰ Cir. 2004) that the Monell claim is not "on hold" due to the statute of limitations are also not well taken. First, in James, the district court granted the motion to dismiss, dismissed the remaining claims without prejudice and **_entered judgment_**. James, 283 F.3d at 1065. Here, as stated above, the district court specifically declined to enter judgment. Further, though the statute of limitations may have run as to the Monell claim, said claim is not necessarily dead. When a federal cause of action is brought under 42 U.S.C. § 1983, "the relation back provisions of state law, rather than Rule 15(c) govern[.]" Merrit v. Cnty. of L.A., 875 F.2d 765, 768 (9th Cir. 1989). An amended complaint relates back to the original complaint under California law if the amended complaint (1) rests on the same general set of facts, (2) involves the same injury, and (3) refers to the same instrumentality, as the original one." Norgart v. Upjohn Co., 21 Cal.4th 383, 408-09 (1999). Notably, a voluntary dismissal without prejudice does not break the relation back chain. Pratt v. Gamboa, 2020 U.S. Dist. LEXIS 87109, at *29 (N.D. Cal. May

15, 2020). As such, the Officers cannot be assured that they will not face the resurrected <u>Monell</u> claim in the future.

For all these reasons, this Court currently lacks jurisdiction over this appeal. This Court will continue to lack jurisdiction until such time as either (1) the <u>Monell</u> claim is dismissed with prejudice; or (2) the adjudicated claims are certified under Rule 54(b) for immediate appeal; or (3) the <u>Monell</u> claim is refiled, and a final appealable judgment is obtained as to the entire action. <u>See</u> <u>Adonican v. City of Los Angeles</u>, 297 F.3d 1106, 1108 (9th Cir. 2002).

## III.   <u>ISSUES PRESENTED FOR REVIEW</u>

1.   **Qualified Immunity Prong 1 -- Reasonableness of the Force**.

Viewing the facts from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight:

    (a)     Was the controlling force used by the Officers during the course of the arrest objectively reasonable under the circumstances of Decedent actively struggling against the Officers' attempts to take him into custody?

(b)     Was allowing Decedent to roll into a prone position after attempting multiple times to keep him on his side objectively reasonable under the circumstances?

2.     **Qualified Immunity Prong 2 – Clearly Established Law**.

At the time of the incident, did the law clearly establish, beyond debate:

(a)     That the Officers' use of controlling force in these circumstances was an unlawful violation of the Fourth Amendment?

(b)     That the Officers' use of a TASER in these circumstances was an unlawful violation of the Fourth Amendment?

(c)     The Officers allowing Decedent to roll into a prone position after attempting multiple times to keep him on his side was an unlawful violation of the Fourth Amendment?

3.     **Fourteenth Amendment Claims**. In the absence of a Fourth Amendment constitutional violation and/or in light of the law not being clearly established beyond debate, did the district court properly grant summary judgment as to Appellant's Fourteenth Amendment claims?

## IV.   STATEMENT OF CASE

### A.   Summary of Relevant Facts

This action arises out of the August 14, 2020 arrest of Decedent, who was suspected of attempted residential burglaries. 5-ER-1077; 2-ER-208. Los Angeles Police Department ("LAPD") officers were dispatched after multiple 911 calls from citizens who reported that Decedent was attempting to forcibly enter several residences. 5-ER-1077. Decedent appeared to be under the influence of drugs or alcohol and seemed confused. 2-ER-208. As Officers arrived on the scene, they observed Decedent approach a chain link fence leading to a wash. Id; 6-ER-1202 at 5:55-6:05. One of the officers repeatedly instructed Decedent to get on the ground. 6-ER-1202 at 5:55-6:05; 5-ER-1078. Decedent momentarily faced the officers then turned and began to climb the chain linked fence leading to the wash. Id.

Decedent grabbed the top of the fence and lifted himself over, appearing to drag his chest and abdomen across the top of the fence before falling to the ground on the opposite side. Id. As the Officers approached the fence line, they observed Decedent lying partially on his left side, face down at the bottom of the embankment, with his back facing south and his hands partially out of view. 6-ER-1202 at 6:18; 5-ER-1078; 2-ER-208. Officers Beckstrom, Lopez, Moser and Romero went into the bottom of the wash. 2-ER-209; 6-ER-1202 at 7:43, 1203 at 8:20, 1204 at 8:26

and 1205 at 9:23. The Officers planned to Lopez to provide less-lethal cover with a beanbag shotgun, for Beckstrom and Romero to arrest Rivera, and for Moser to provide communications support. 6-ER-1202 at 9:00-9:16. Due to the nature of the radio call, the Officers believed that Decedent may be armed with a weapon or carrying burglary tools that could be used as weapons. 5-ER-1079.

Before they approached, Officers instructed Decedent in English to lay on his stomach and in Spanish to show his hands and place his hands out to his sides. 6-ER-1202 at 9:50-10:15 and 1204 at 10:38-11:00; 2-ER-209; 5-ER-1079. Decedent did not respond to any of the commands. Id. Romero and Beckstrom approached Decedent together, with Beckstrom instructing Decedent in Spanish not to move. 6-ER-1202 at 10:20-10:24; 5-ER-1300. Beckstrom immediately pressed his left hand on the back of Decedent's right shoulder while simultaneously grabbing Decedent's right wrist with his right hand and instructed Decedent to "give me your hand." 6-ER-1202 at 10:23. Beckstrom also placed his left knee on Decedent's lower back to prevent Decent, who was still lying partially on his left side, from turning over. Id. at 10:24.

Simultaneously, Romero grabbed Decedent's left wrist and forearm with both hands and placed his right knee on the left side of Decedent's back. Id. Decedent immediately tensed up his body and tried to buck off the Officers and roll. 6-ER-

1202 at 10:24; 2-ER-211; 5-ER-1301. As the struggle continued, Beckstrom told Decedent to calm down. 6-ER-1202 at 10:25; 5-ER-1301. Instead, Decedent continued to shift his midsection from left to right attempting to lift his body upward. Id. Romero was able to apply a single cuff to Decedent's left wrist. 6-ER-1202 at 10:35; 5-ER-1301. At this point, Moser unholstered his TASER and warned Decedent that "you are going to get tased dude. Stop." 6-ER-1202 at 11:00; 5-ER-1301. Realizing it would be very difficult to handcuff Decedent using the single set of handcuffs, Romero requested a second set. 6-ER-1204 at 11:20; 5-ER-1080. Despite Decedent continuing to actively struggle, Lopez was able to attach a second set of handcuffs to the initial unsecured cuff. 6-ER-1204 at 11:20-11:46; 5-ER-1080.

Decedent then clenched his hands together behind his head and placed his left thumb through the open cuff. Id. Lopez gave Decedent repeated commands to release the handcuffs. Id. Moser once again warned Decedent "you're going to get tased. Stop." 6-ER-1204 at 11:30-11:47; 5-ER-1080. Despite the warning, Decedent continued to struggle and to grip the handcuffs by wrapping his fingers inside one of the two cuffs that had been joined together. 6-ER-1204 at 11:47-13:12; 5-ER-1080. Decedent continued to actively struggle with the Officers during which struggle Lopez and Beckstrom at various times held Decedent's head down to prevent movement. 6-ER-1204 at 11:47-13:12. With Decedent continuing to

actively resist, Moser placed his TASER against Decedent's left rear thigh and fired. 6-ER-1205 at 12:41-12:58; 5-ER-1081. The TASER had no effect. 6-ER-1205 at 12:41-12:58; 5-ER-1082.

Decedent continued to raise his hips as if trying to "buck" Beckstrom off, so Moser warned Decedent that he was going to deliver a second application of the TASER. 6-ER-1205 at 12:54; 5-ER-1081. Moser then placed the contacts of the TASER cartridge against Decedent's left calf and delivered a three-point drive stun. 6-ER-1205 at 12:54-13:54; 5-ER-1081. The officers were still unable to pull Decedent's hands behind his back. Id. With Decedent still actively struggling, Moser delivered a second three point drive stun (and third overall TASER application) to Decedent's left calf approximately fourteen seconds after the first three point drive stun. Id. Decedent began kicking his legs towards Moser's hand and Beckstrom, simultaneously rocking his shoulders back and forth and continuing to try to place his hands under his body and lift his hips to buck or move Beckstrom off of his back. Id. Moser then delivered a third three point drive stun (and fourth overall TASER application) to Decedent's left calf. Id. Because the TASER did not appear to be effective, Moser did not use it again. Id.

Nearly simultaneous with Moser's last TASER application, Beckstrom straddled Decedent's lower back with his knees on the ground.6-ER-1202 at 12:44-

13:29 and 1204 at 12:48-13:17. Space can be seen between Decedent and Beckstrom's legs. Id. Beckstrom also applied downward pressure to Decedent's upper back with his right forearm. Id. Immediately prior to Beckstrom straddling Decedent, Romero removed his right knee from Decedent's back and repositioned it on the ground next to Decedent. 6-ER-1205 at 12:43-13:23; 5-ER-1083. Romero's right knee had been on Decedent's upper left back and shoulder area for approximately fifty-three seconds. Id. The BWC footage made clear very little body weight was placed on Decedent during that time because Romero's right foot remained on the ground. 6-ER-1202, 1204 and 1205. After a struggle involving four officers that lasted approximately two minutes, Decedent was finally handcuffed using a double set of handcuffs. 5-ER-1083.

At this time the Officers were finally able to conduct a search of Decedent's waistband and pockets to determine that Decedent was not armed. Id. Even after he was handcuffed, Decedent continued to buck his hips and lift his body. 6-ER-1204 at 16:22-16:44. In an effort to control Decedent's legs and prevent him from pulling them under his body, Beckstrom told Lopez to apply a hobble restraint on Decedent's ankles. Id. at 13:13-13:20.

After the hobble was placed, Beckstrom and Romero turned Decedent to his left side. Id. at 14:16-15:10. Decedent forced himself into a prone position and

continued to do that each time the Officers attempted to keep him on his side. 6-ER-1204 at 15:05-15:20; 5-ER-1084. Decedent remained face down for approximately two minutes and thirty-five seconds. 6-ER-1204 at 15:05-17:46; 5-ER-1084. During this time, Beckstrom and Romero stood over Decedent and maintained contact by placing their hands on Decedent's arm and back. Id.

Eventually, Romero was able to roll Decedent onto his left side and held him in that position. 6-ER-1204 at 17:36-20:52; 5-ER-1085. Decedent remained on his left side for approximately three minutes and eleven seconds as the officers continued to monitor him and wait for the arrival of the rescue ambulance (RA). Id. While waiting for the RA, the Officers noticed that Decedent's condition started to deteriorate and noted that Decedent appeared to be unconscious and was experiencing labored breathing. 6-ER-19:40-24:20; 5-ER-1085-86. Paramedics arrived, the handcuffs and hobble were removed and CPR was provided. Id. Unfortunately, Decedent failed to respond to those efforts, and he was pronounced dead at the scene. Id.

### B. Procedural History and the Challenged District Court Order

Appellants filed their First Amended Complaint, the operative complaint, on September 9, 2021. 6-ER-1267-1296. As outlined above, the First Amended Complaint stated seven claims against the Officers including federal and state law

claims. Id. On January 17, 2022, the Officers filed a Motion for Summary Judgment. 6-ER-1234-1264. On March 28, the district court entered its order granting the Motion for Summary Judgment as to the First, Second, and Fourth Causes of Action for Violation of 42 U.S.C. § 1983 (4th and 14th Amendments) and denying the Motion as to the state law claims. 1-ER-002-0025.

Specifically, as to the Fourth Amendment excessive force claim, the district court found that the Officers' use of controlling force during the arrest of Decedent was objectively reasonable under the circumstances thus the Officers did not violate Decedent's Fourth Amendment rights. 1-ER-0019. Additionally, the district court found that, even assuming that the controlling force constituted a constitutional violation, the Officers were entitled to qualified immunity because it was "not clearly established that the Individual Officers' use of controlling force under these particular circumstances would be a violation of Decedent's Fourth Amendment rights." Id.

As to the use of the TASER, the district court found that "there may be sufficient evidence for a jury to conclude that Decedent's Fourth Amendment rights were violated by the use of the TASER." 1-ER-0021. However, the district court concluded that the Officers were "entitled to qualified immunity because it was not clearly established that Moser's use of the TASER under these particular

circumstances would be a violation of Decedent's Fourth Amendment rights." 1-ER-0021-22. Further, the district court found that the Officers did not violate Decedent's Fourth Amendment rights by allowing Decedent to roll into a prone position and remain there for two and a half minutes. 1-ER-0023. Additionally, the district court found that, even assuming that allowing Decedent to roll into a prone position constituted a constitutional violation, the Officers were entitled to qualified immunity because it was "not clearly established that the conduct of the Individual Officers of allowing Decedent to roll into a prone position without any contact or help by the Individual Officers and allowing Decedent to remain in a prone position under these circumstances would be a violation of Decedent's Fourth Amendment rights." 1-ER-0024.

Finally, with respect to Appellant's Fourteenth Amendment claims, the district court said that "because the Court has concluded that the Individual Officers are entitled to summary judgment in their favor on Decedent's Fourth Amendment excessive force claim alleged the first cause of action, the Individual Officers are entitled to summary judgment on Plaintiffs' Fourteenth Amendment claims alleged in the second and fourth cause of action because there is no underlying constitutional violation to support the Fourteenth Amendment right to familial association claim and, even if there is an underlying constitutional violation, the Individual Officers

are entitled to qualified immunity on Appellants' Fourteenth Amendment claims for the same reasons that they are entitled to qualified immunity on Decedent's Fourth Amendment claim." 1-ER-0025. The district court's denial of the Motion for Summary Judgment as to the state law claims is not at issue in this appeal.

## V.  <u>SUMMARY OF ARGUMENT</u>

Here, the district court addressed three uses of force – the use of controlling force by the Officers, allowing Decedent to roll into a prone position, and use of the TASER. As to the controlling force and Decedent rolling into a prone position, summary judgment was correctly granted on the first prong of the qualified immunity analysis. That is, both those uses of force were reasonable as a matter of law. As to the use of the TASER, the district court correctly granted summary judgment on the second prong of the qualified immunity analysis. That is, that the law was not clearly established, at the time of the incident involving Decedent, that the Officers' use of the TASER violated the Fourth Amendment. The district court further correctly determined that even if the Officers controlling force and allowing Decedent to roll into a prone position *had* been unreasonable, qualified immunity was nonetheless appropriate because the law was not clearly established that either use of force violated the Fourth Amendment. Finally, the district court correctly

determined that Appellants' Fourteenth Amendment claims for familial relationship are contingent on their Fourth Amendment claim thus fail in light of the failure of those Fourth Amendment claim.

## VI.  STANDARD OF REVIEW AND QUALIFIED IMMUNITY STANDARD

### A.  Standard of Review

The Officers agree that this Court is charged with reviewing the district court's ruling on the MSJ, including its rulings on qualified immunity, de novo. Rosenbaum v. Washoe Cty., 663 F.3d 1071, 1075 (9th Cir. 2011). Whether a plaintiff's federal rights were clearly established at the time of the alleged violation is also a question of law reviewed de novo. Boyd v. Benton County, 374 F.3d 773, 778 (9th Cir. 2004); Elder v. Holloway, 510 U.S. 510, 516, 114 S.Ct. 1019, 1023 (1994).

In reviewing a summary judgment ruling, this Court must review the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. Galvin v. Hay, 374 F.3d 739, 745 (9th Cir. 2004). However, the Court should only draw *reasonable* inferences in favor of the nonmoving party to the extent supportable by the record. Scott v. Harris, 550 U.S. 372, 380-81, 127

S.Ct. 1769, 1776 (2007). Where there is objective video evidence, facts should be construed in the light established by the objective video evidence. Id. at 380. More specifically, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Estate of Lopez v. Gelhaus, 871 F.3d 998, 1008 (9th Cir. 2017) *citing* Scott, 550 U.S. at 380-81 [addressing video evidence utterly discrediting a party's version of events]. Moreover, the non-moving party is not entitled to all merely possible inferences, only the justifiable, reasonable inferences. Anderson v. Liberty Lobby, 477 U.S. 242, 255 (1986); Villarimo v. Aloha Island Air, Inc., 281 F. 3d 1054, 1065 fn. 10 (9th Cir. 2002).

### B.   Qualified Immunity Legal Standards

When considering a claim of qualified immunity, courts engage in a two-part inquiry: do the facts show that the defendant violated a constitutional right, and was the right clearly established at the time of the defendant's purported misconduct? Delia v. City of Rialto, 621 F.3d 1069, 1074 (9th Cir. 2010) *quoting* Pearson v. Callahan, 555 U.S. 223, 231-32, 129 S. Ct. 808; 172 L. Ed. 2d 565 (2009).

"A negative answer [of either prong] ends the analysis, with qualified immunity protecting the defendants from liability." Clement v. Gomez, 298 F.3d

898, 903 (9th Cir. 2002). A court may however exercise its discretion in reaching the second prong first, which is solely a question of law. Dunn v. Castro, 621 F.3d 1196, 1199 (9th Cir. 2010); Brosseau v. Haugen, 543 U.S. 194, 201-02, 125 S. Ct. 596; 160 L. Ed. 2d 583 (2004). More importantly, police officers are presumed to be protected by qualified immunity. See Gasho v. United States, 39 F.3d 1420, 1438 (9th Cir. 1994). "To overcome this presumption [of qualified immunity protection], a plaintiff must show that the officer's conduct was 'so egregious that any reasonable person would have recognized a constitutional violation.'" Id. [internal citations omitted]. The standard is a demanding one. The contours of a right must be "sufficiently clear that *every* reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 563 U.S. 731, 742, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011) [emphasis added]. Thus, the standard is not whether clearly established law *supported* the officer's use of force, rather it is whether an officer's conduct was *prohibited* by clearly established law.

The Supreme Court has repeatedly stressed the importance of qualified immunity, and recently reemphasized that importance in the case of White v. Pauly, 580 U. S. 73, 137 S. Ct. 548, 196 L. Ed. 2d 463 (January 9, 2017) (per curiam). In White, the Supreme Court addressed the denial of qualified immunity to police officers on a Fourth Amendment excessive force claim by the Tenth Circuit. The

Supreme Court began by stating that "qualified immunity attaches when an official's conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" White, 580 U. S. at 77 *citing* Mullenix v. Luna, 577 U. S. 7, 11, 136 S. Ct. 305; 193 L. Ed. 2d 255, 257 (2015).

Further, the Court stated that while "case law 'does not require a case directly on point' for a right to be clearly established, 'existing precedent must have placed the statutory or constitutional question ***beyond debate***.'" Id. [emphasis added]. Concluding, "[i]n other words, immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" Id. The Court also emphasized the importance of the qualified immunity doctrine saying it is "important to society as a whole" noting that qualified immunity "is effectively lost if a case is erroneously permitted to go to trial." White, 580 U. S. at 77-78.

The Supreme Court then somewhat chastised the federal Circuit Courts stating: "In the last five years, this Court has issued a number of opinions reversing federal courts in qualified immunity cases." White, 580 U. S. at 79. The White Court then continued "[t]oday, it is again necessary to reiterate the longstanding principle that 'clearly established law' should not be defined 'at a high level of generality'." White, 580 U.S. at 79 *citing* Ashcroft v. al-Kidd, 563 U.S. 731, 742, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011).

The Supreme Court found that the Tenth Circuit had misunderstood the clearly established analysis in that it "relied on Graham, Garner, and their Court of Appeals progeny, which lay out excessive-force principles at only a general level" and concluded that general statements of the law are not inherently incapable of giving fair and clear warning to officers and that "Garner and Graham do not by themselves create clearly established law outside an obvious case." White, 580 U.S. at 80. In the case of Kisela v. Hughes, 138 S. Ct. 1148, 200 L. Ed. 2d 449, (2018), the Supreme Court overturned this Court and warned lower courts that they must not define "clearly established" law with a high level of generality in deciding whether police officers are entitled to qualified immunity.

In Kisela, Plaintiff Hughes sued Andrew Kisela, a police officer, under 42 U.S.C. § 1983 for excessive use of force in violation of the Fourth Amendment. Kisela responded to a call of a woman, Hughes, hacking a tree with a kitchen knife. Id. at 1151. At the location, Kisela saw Hughes who matched the description from the call emerge from the house carrying a large knife at her side, moved towards another individual present, and ignored commands to drop the knife. Id. Hughes stopped no more than six feet from the other individual and appeared to be calm. Id. The court described this as "striking distance." Id. at 1154. The officers opened fire on the suspect less than a minute from first seeing her. Id. at 1151. This Court held

that Kisela was not entitled to qualified immunity.

In reversing, the Supreme Court began by noting: "This Court has repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality." Id. at 1152 [internal citations omitted]. The Court then explained that the qualified immunity doctrine is particularly important in the Fourth Amendment context "where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." Id. Accordingly, "[u]se of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." Id. at 1153 [internal citations omitted].

Even more recently, in City of Tahlequah v. Bond, 142 S. Ct. 9, 211 L. Ed. 2d 170 (2021), the Supreme Court reiterated its order not to define clearly established law at a high level of generality. Bond at 11. The Court then granted qualified immunity to officers who engaged in a conversation with a suspect, followed him into a garage at a distance of 6 to 10 feet, and shot the suspect who was holding a hammer when he took a stance as if he was about to throw the hammer or charge at the officers. Id. at 12.

As the Court observed in <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982), failure to apply qualified immunity inflicts "social costs," which "include the expenses of litigation, the diversion of official  energy from pressing public issues, and the deterrence  of able citizens from acceptance of public office," as well as "the danger that fear of being sued will 'dampen the ardor of all but the most resolute, or the most irresponsible [public officials], in the unflinching discharge of their duties.'" <u>Id.</u> at 814.

## VII.  <u>LEGAL ARGUMENT</u>

Peace officers "are the guardians of the peace and security of the community, and the efficiency of our whole system, designed for the purpose of maintaining law and order, depends upon the extent to which such officers perform their duties...." <u>Christal v. Police Com. of San Francisco</u>, 33 Cal. App. 2d 564, 567 (Cal. App. 1939). As one court commented, "police officers [exercise] the most awesome and dangerous power that a democratic state possesses with respect to its residents -- the power to use lawful force to arrest and detain them." <u>Policeman's Benev. Ass'n of N.J. v. Washington Tp.</u>, 850 F.2d 133, 141 (3rd Cir. 1988). This authority, however, is not without limitations. The law requires peace officers, while facing extreme

danger, to constantly assess the circumstances they face and perform in a professional manner.

There is a limit, however, to what society can ask of its officers. The restrictions placed upon them must allow them to protect their own safety. "We must never allow the theoretical, sanitized world of our imagination to replace the dangerous and complex world that policemen face every day. What constitutes 'reasonable' action may seem quite different to someone facing a possible assailant than to someone analyzing the question at leisure." Smith v. Freland, 954 F.2d 343, 347 (6th Cir. 1992). Here, the district court properly balanced these competing interests. Specifically, the district court addressed three actions by the Officers that Appellants' alleged constituted excessive force – use of controlling force, use of a TASER and allowing Decedent to roll into a prone position -- and correctly determined that the Officers' use of force in this case was either reasonable as a matter of law or that the law was not clearly established that the Officers' conduct would be a violation of Decedent's Fourth Amendment rights.

**A.** **The District Court Correctly Determined that the Controlling Force and Allowing Decedent to Roll Into a Prone Position Was Reasonable as a Matter of Law Under the First Prong of the Qualified Immunity Analysis**

As discussed above, when considering a claim of qualified immunity, the first inquiry is whether the facts show that the defendant violated a constitutional right. Delia, supra 621 F.3d at 1074. Here, in addressing the first prong, the district court correctly determined that the controlling force and allowing Decedent to roll into a prone position were reasonable as a matter of law.

A determination of the extent to which a particular use of force is "reasonable" cannot be achieved through a mechanical application of a particular test. Instead, the appropriate analysis requires careful attention to the facts and circumstances of each particular case. See Graham v. Connor, 490 U.S. 386, 396, 109 S. Ct. 1865; 104 L. Ed. 2d 443 (1989) and Tennessee v. Garner, 471 U.S. 1, 7-8, 105 S. Ct. 1694, 85 L. Ed. 2d 1 (1985). The Fourth Amendment requires peace officers making an arrest to use only the amount of force that is objectively reasonable considering the circumstances facing them. Tennessee supra 471 U.S. at 7-8. "Not every push or shove, even if it may seem unnecessary in the peace of the judge's chambers, . . . violates the Fourth Amendment. Graham, supra 490 U.S. at 396 [citation and

quotation marks omitted]. Further, it is well-settled that "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Id. citing Terry v. Ohio, 392 U.S. 1, 20-22, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

As such, the standard for evaluating uses of force is one of reasonableness requiring "careful attention to the facts and circumstances of each particular case," without the "20/20 vision of hindsight," adopting "the perspective of a reasonable officer on the scene," and making "allowance for the fact that police officers are often forced to make split second judgments – in circumstances that are tense, uncertain, and rapidly evolving." Graham, 490 U.S. at 396-97; Scott v. Harris, 550 U.S. 372, 383; 127 S. Ct. 1769; 167 L. Ed. 2d 686 (2007). Whether a specific use of force is reasonable requires a court to balance the nature and quality of the intrusion on an individual's liberty with the countervailing governmental interests at stake. Graham, 490 U.S. at 396; see also Smith v. City of Hemet, 394 F.3d 689, 701 (9th Cir. 2005) That analysis is conducted using a three-step inquiry.

First, the gravity of the particular intrusion on Fourth Amendment interests is assessed by evaluating the type and amount of force used. See Chew v. Gates, 27 F.3d 1432, 1440 (9th Cir. 1994). Second, the importance of the government interests is taken into account by evaluating: "(1) the severity of the crime at issue, (2) whether

the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight." Smith, 394 F.3d at 701 *quoting* Graham, 490 U.S. at 396. Third, the gravity of the intrusion on the alleged victim's liberty is balanced against the government's need for that intrusion. Miller, 340 F.3d at 964. These standards provide law enforcement officers appropriate flexibility to make the split-second judgments required of them. Here, each prong of the Graham analysis weighs heavily in favor of the force used by the Officers.

### 1. The Controlling Force Used by the Officers Was Reasonable as a Matter of Law

The first step in determining the reasonableness of the force used by the Officers requires the Court to examine the type and amount of force employed on Decedent. While doing so, the Court must keep in mind that police officers "are not required to use the least intrusive degree of force possible," but only must act within a reasonable range of conduct. Marquez v. City of Phoenix, 693 F.3d 1167, 1174 (9th Cir. 2012) [quotation omitted]. Here, the first use of force at issue was mere controlling force; thus the nature and quality of the intrusion on Decedent's Fourth Amendment interests was decidedly not significant. Indeed, the controlling force that the Officers used against Decedent was far less intrusive than the types of force

at issue in most excessive force cases with respect to both type and amount of force used.

Moreover, the way in which the Officers manually restrained Decedent is vastly different from incidents that the Ninth Circuit has found excessive force. See, e.g., Drummond ex rel. Drummond v. City of Anaheim, 343 F.3d 1052, 1056 (9th Cir. 2003) [finding that officers applying their weight to a suspect's neck and torso while he lay handcuffed on the ground was "severe and . . . capable of causing death or serious injury."]; Davis v. City of Las Vegas, 478 F.3d 1048, 1055 (9th Cir. 2007) [deeming an officer's conduct "extremely severe," when he slammed a handcuffed suspect head-first into a wall, pressed his knee into his back, and punched him in the face). In contrast to these examples, the Officers used extremely minimal force in arresting Decedent. Indeed, though Appellants attempt to equate the force used upon with Decedent with significant pressure on a subdued suspect's back or neck such as in Drummond, the objective video evidence here, taken from multiple angles, conclusively establishes that very little body weight was placed on Decedent. 6-ER-1202, 1204 and 1205.

While the two officers in Drummond literally "squeez[ed] the breath" from Drummond by "press[ing] their weight against his torso and neck, crushing him against the ground" for a "substantial period of time,"(343 F.3d at 1059-60 & n.7),

the Officers actions here did not involve any such direct, sustained compression with the officers' body weight. See 6-ER-1202, 1204 and 1205. Rather than being pinned under the body weight of the Officers as in Drummond, the BWC footage demonstrates that the Decedent was continually moving his upper and lower body during the entire event including attempting to kick Beckstrom when Beckstrom was straddling Decedent. See 6-ER-1202, 1204 and 1205. Even when Beckstrom straddled Decedent, the BWC footage clearly demonstrates that there was an open gap between Decedent and Beckstrom with the majority of Beckstrom's weight on his own knees, which were on the ground on either side of Decedent, not on Decedent's back. Id. Additionally, unlike in Drummond, Decedent never showed any signs of respiratory distress and never said he was unable to breathe throughout the two minutes Decedent resisted the Officers instead yelled various things throughout the encounter. Id. In short, the controlling force used against Decedent was not intrusive and certainly nowhere near as intrusive as the cases argued by Appellants.

As to the severity of the crime and threat to the officers or others, Decedent was suspected of committing commercial burglaries – possible felonies. 5-ER-1077. "The government has an undeniable legitimate interest in apprehending criminal suspects, . . . and that interest is even stronger when the criminal is . . . suspected of

a felony." Miller, 340 F.3d at 964 [citations omitted]. When dealing with a felony suspect, the "severity of the crime" factor "strongly favors the government." Id. Though burglary is a wobbler capable of being charged as a misdemeanor, the Supreme Court of California has clearly interpreted Penal Code section 459 [burglary] as more than simply a "property crime". "We have construed section 459 as having two functions: to protect against the increased risk to personal safety that attends the commission of a felony inside the enumerated locations, and to prevent the invasion of an owner's or occupant's possessory interest in a space against a person who has no right to be in the building." People v. Garcia, 62 Cal. 4th 1116, 1125-1126 (Cal. 2016) [citation omitted]. As stated by the California Supreme Court in People v. Gauze, 15 Cal. 3d 709, 715 (Cal. 1975):

> Burglary laws are based primarily upon a recognition of the ***dangers to personal safety*** created by the usual burglary situation -- the danger that the intruder will harm the occupants in attempting to perpetrate the intended crime or to escape and the danger that the occupants will in anger or panic react violently to the invasion, thereby inviting more violence. The laws are primarily designed, then, not to deter the trespass and the intended crime, which are prohibited by other laws, so much as to forestall the germination of a situation dangerous to personal safety. Section 459, in short, ***is aimed at the danger caused by the unauthorized entry itself***. Id. [emphasis added and citation omitted].

In other words, burglary *can* be a misdemeanor though it also can be a very serious felony and the Officers here reasonably believed that Decedent was a felony suspect

possibly armed with burglary tools that could be as weapons. 5-ER-1079. Moreover, the Officers were not able to search Decedent until after the struggle involving four officers and after Decedent was finally handcuffed using a double set of handcuffs. See 5-ER-1083; 6-ER-1202, 1204 and 1205. Therefore, the severity of the crime and threat to the Officers prongs weigh heavily in favor of the Officers.

As to the third and final prong, whether Decedent attempted to evade or flee arrest, that prong also heavily favors the Officers. Prior to the use of controlling force, Decedent had ignored multiple commands and retreated away from the Officers and over a fence. 5-ER-1078. Before they approached, Officers instructed Decedent in English to lay on his stomach and in Spanish to show his hands and place his hands out to his sides. 2-ER-209; 5-ER-1079. Decedent did not respond to any of the commands. Id. Romero and Beckstrom approached Decedent together, with Beckstrom instructing Decedent in Spanish not to move. 5-ER-1300; 6-ER-1202 at 10:20-10:24. Decedent ignored all these commands, immediately tensed up his body after the Officers made contact and tried to buck off the Officers and roll. 2-ER-211; 5-ER-1301; 6-ER-1202 at 10:24 et seq.. As the struggle continued, Beckstrom told Decedent to calm down. 5-ER-1301; 6-ER-1202 at 10:25. Instead, Decedent continued to actively resist the Officers by shifting his midsection from left to right attempting to lift his body upward. 6-ER-1202 at 10:24 et seq.. In short,

during the time that the Officers were using the controlling force, Decedent was actively and violently resisting the Officers. For all these reasons, controlling force used by the Officers was reasonable as a matter of law.

## 2. Allowing Decedent to Roll Into a Prone Position Was Reasonable as a Matter of Law

Relying on Drummond and Garlick v. County of Kern, 167 F.Supp. 3d 1117 (E.D. Cal. 2016), Appellants argue that Decedent's Fourth Amendment rights were violated in that the Officers forced Decedent to remain in a prone position and "actively precluded Decedent from rolling onto his sides and used their body weight to accomplished this goal. Opening Brief at p.50. However, as discussed in detail above, Appellants' assertions are directly contradicted by the BWC footage.

During the encounter with the Officers, Decedent rolled into a prone position on his own volition. Decedent was not "forced" into a prone position. After Decedent was handcuffed and hobbled, the Individual Officers immediately placed Decedent on his left side and held him there for approximately fifty-two seconds. 6-ER-1204 at 14:16-20:00. However, Decedent continued to move his hips and twist away from the Officers until he was able, without any contact or help by the Officers, to turn onto his front in a semi-prone position, with his right hip raised from the ground and his left hand under his midsection. Id. Romero tried but was unable to roll Decedent

back to his left side due in part to Decedent's resistance. Id. After Decedent voluntarily rolled onto his stomach, Decedent could not be kept on his left side because he would continually roll onto his stomach. Id. Once Decedent was on his stomach, Decedent seemed to calm down. Id.

In addition, while Decedent was on his stomach, he was talking and he never appeared to be in any distress. Id. Although some of the Officers placed a hand or a knee against Decedent to provide a barrier to prevent Decedent from rolling over, none of the Officers placed their body weight on Decedent. Id. Moreover, throughout the two minutes and thirty-five seconds that Decedent was in a prone position, the Officers repeatedly checked on Decedent's condition, spoke with Decedent in a calm tone and manner, and checked with dispatch as to the arrival time of the RA that had previously been called. Id. This Court concluded in Tatum v. City & Cty. of S.F., 441 F.3d 1090, 1098 (9th Cir. 2006) that "it was objectively reasonable to position [the decedent] on his stomach for approximately ninety seconds under the circumstances of his arrest" and stated that "Tatum has not cited any authority to support her argument that simply laying a suspect on his stomach can constitute excessive force, and we have found none." Therefore, despite Appellant's attempts to mischaracterize the indisputable video evidence, the Officers

did not violate Decedent's Fourth Amendment rights by allowing him to roll, on his own, into a prone position.

**B.** **The District Court Correctly Determined that the Officers Did Not Violate Clearly Established Law With Their Use of Controlling Force, Use of the TASER or in Allowing Decedent to Roll Into a Prone Position**

As discussed at length above, Decedent suffered no constitutional violation of any sort. However, assuming arguendo this Court were to find that a constitutional violation *had* occurred, the Officers are nonetheless entitled to qualified immunity. Qualified immunity is especially applicable in excessive-force cases, where it applies "to protect officers from the sometimes 'hazy border between excessive and acceptable force.'" Saucier v. Katz, 533 U.S. 194, 206, 121 S. Ct. 2151, 2158, 150 L. Ed. 2d 272 (2001) *quoting* Priester v. Riviera Beach, 208 F.3d 919, 926-927 (11th Cir. 2000). Here, it was anything but "apparent in light of pre-existing law" that the Officers' uses of force were unconstitutional.

**1.** **The District Court Correctly Determined that the Officers Did Not Violate Clearly Established Law With Their Use of Controlling Force**

Though the district court found that Decedent's Fourth Amendment rights were not violated by the Officers with respect to the controlling force, the court addressed the second prong of the qualified immunity analysis and correctly determined that the Officers' conduct did not violate clearly established law. 1-ER-0019-20. While "it [is] clearly established . . . that exerting significant, continued force on a person's back while that person is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force", that is not even remotely what happened in the case at hand. See McCue v. City of Bangor, 838 F.3d 55, 64 (1st Cir. 2016) [collecting cases, including Drummond ex rel. Drummond v. City of Anaheim, 343 F.3d 1052, 1057 (9th Cir. 2003)].

As discussed in great detail above, the controlling force used upon Decedent was not "significant", was not "continued" and Decedent was not "subdued or incapacitated" rather was actively struggling. The Officers actions here did not involve any such direct, sustained compression with the Officers' body weight as in the cases cited by Appellants; thus, those cases are vastly factually dissimilar to the facts of the case at hand thus do not "squarely govern" this case. See Kisela, supra

138 S. Ct. 1148 and <u>City of Escondido v. Emmons</u>, 139 S. Ct. 500, 503 (2019). Therefore, the district court correctly determined that, even assuming a constitutional violation, the Officers did not violate clearly established law with their use of controlling force.

> ### 2. The District Court Correctly Determined that the Officers Did Not Violate Clearly Established Law With Their Use of the TASER

It is clearly established that officers cannot use intermediate force via use of a TASER when a suspect is restrained, has stopped resisting, and does not pose a threat. <u>Hyde v. City of Willcox</u>, 23 F.4th 863, 873 (9th Cir. 2022). <u>In Jones v. Las Vegas Metro. Police Dep't</u>, 873 F.3d 1123 (9th Cir. 2017), for example, qualified immunity was denied to an officer who used a taser on a suspect that had already been subdued, while the suspect was being placed in handcuffs.

Here, Appellants cite to two cases to support their contention that the Officers violated a clearly established right in tasing Decedent however both are extremely factually dissimilar from the facts of the case at hand thus cannot form the basis of clearly established law. Specifically, Appellants argue that <u>Mattos v. Agarano</u>, 661 F.3d 433 (9th Cir. 2011) and <u>Bonivert v. City of Clarkston</u>, 883 F.3d 865 (9th Cir. 2018) that the Officers could not use a TASER here against someone who is

"actively resisting but poses no immediate threat". But this rule is described too generally, and each case contains a very different set of facts both from each other and from the case at hand.

In Mattos, the court found use of a TASER violated the Fourth Amendment but did so under a factual pattern radically different from that here. In Mattos, officers repeatedly tased a very pregnant woman, who had committed a minor traffic violation, who offered minor resistance of grabbing her steering wheel to prevent officers from pulling her out of her car but whose "resistance did not involve any violent actions towards the officers", and who "did not attempt to flee". See Mattos, supra 661 F.3d at 445. Further, the Mattos court noted that, not only did the officers have time to consider options, they *in fact* discussed whether or not to apply a TASER to a pregnant woman before doing it.

The contrast of those facts with the Officers' encounter with Decedent here is obvious. Decedent was not a pregnant woman, was suspected of a felony rather than a minor crime, was suspected of a crime that reasonably carries with it the threat of violence as discussed in detail above, a crime that reasonably carries with it the threat the Decedent was armed with burglary tools that could be used as weapons, ignored numerous commands from the Officers, fled and in fact climbed a fence to flee from the Officers and actively struggled with the Officers bucking his body and thrashing

his arms even after an Officer got a single handcuff on him warned that he would be tased if he did not stop struggling with the Officers. Mattos cannot possibly be said to "squarely govern" this case. See Kisela, supra 138 S. Ct. 1148.

Similarly, the facts of Bonivert are equally unavailing to clearly establish law with regard to the case at hand. In Bonivert, officers responded to a misdemeanor domestic violence call. When the suspect would not open the door, the officers smashed a window, forced entry, tackled the suspect and deployed a TASER on him multiple times. Bonivert, supra 883 F.3d at 871. The court denied qualified immunity specifically noting that "the evidence reflects that Bonivert *remained inside the home at all times*" (at 881 [emphasis added]) and was "*never a fleeing suspect*" (at 878 [emphasis added]). Further, "that Bonivert did not threaten or advance toward the officers; that Bonivert posed no immediate threat to the officers; that Combs [the officer] threw Bonivert across the back room; that Bonivert *did not resist arrest*; and that Combs tasered Bonivert several times in drive-stun mode *notwithstanding Bonivert's compliance*." Id. at 881 [emphasis added]. Notably, the officers in Bonivert were assured prior to their entry that there were no weapons in the house and that Bonivert was not a danger to himself. Id. at 877.

Again, Decedent was a felony suspect who fled from police, climbing a fence to do so, was certainly not "compliant" when tased, very actively resisted arrest and

could reasonably be armed with burglary tools at the time he was tased which was prior to him being searched by the Officers. Like <u>Mattos</u>, <u>Bonivert</u> cannot "squarely govern" this case with such crucial factual differences such as the severity of the crime, the level of resistance, and whether the suspect fled or not. See <u>Kisela</u>, supra 138 S. Ct. 1148.

**3.** **The District Court Correctly Determined that the Officers Did Not Violate Clearly Established Law By Allowing Decedent to Roll Into a Prone Position**

Though the district court found that Decedent's Fourth Amendment rights were not violated by the Officers with respect to allowing Decedent to roll into a prone position, the court addressed the second prong of the qualified immunity analysis and correctly determined that the Officers' conduct did not violate clearly established law. 1-ER-0024-25.

Appellants cite to no precedent clearly establishing that allowing a suspect to roll into a prone position on his own volition violates clearly established law. In fact, under <u>Tatum</u> supra 441 F.3d at 1098 it is objectively reasonable to position a suspect on his stomach for approximately ninety seconds under similar circumstances. Thus, Appellants simply cannot establish that the Officers conduct was "so egregious that any reasonable person would have recognized a constitutional violation." <u>Gasho</u>,

supra 39 F.3d at 1438. Appellants have the burden of showing that the unconstitutionality of the Officers' actions was "'apparent in light of pre-existing law.'" Sorrells v. McKee, 290 F.3d 965, 969 (9th Cir. 2002). Appellants clearly cannot meet this burden when at least one case with similar circumstances permit the Officers' actions. Accordingly, the district court correctly determined that, even assuming a constitutional violation, the Officers did not violate clearly established law by allowing Decedent to roll into a prone position.

C. **The District Court Correctly Determined That The Officers Were Entitled to Summary Judgment As to Appellants' Fourteenth Amendment Claims**

Appellants' final argument is that summary judgment was improperly granted as to their Fourteenth Amendment claims for familial association. However, the district court correctly determined that recovery for a violation of the right to familial association is generally contingent on the existence of an underlying constitutional violation. Schwarz v. Lassen Cty. ex rel. Lassen Cty. Jail, 628 F. App'x 527, 528 (9th Cir. 2016). "Since the claim of familial interference is directly related to all the other constitutional claims . . ., the other claims form an integral part of the claim relating to familial interference." Gausvik v. Perez, 392 F.3d 1006, 1008 (9th Cir. 2004).

As described in great detail above, the Officers were properly granted summary judgment as to the Fourth Amendment claims against them. Thus, the contingent familial association claim must fail. Accordingly, the Officers were properly granted summary judgment as to Appellants' Fourteenth Amendment claim.

**D.** **Violations of LAPD Policy Are Not Dispositive Evaluating Whether a Force Used Was Reasonable or Whether the Law Was Clearly Established**

Appellant devotes significant argument to the proposition that the Officers' violation of LAPD TASER policy definitively demonstrates a Fourth Amendment violation in relation to Moser's deployment of the TASER. However, "[v]iolation of a policy does not amount to a violation of the Constitution." Broussard v. Violet, 1989 U.S. Dist. LEXIS 17428 (C.D. Cal. July 24, 1989); see also Barry v. Fowler, 902 F.2d 770, 772 (9th Cir. 1990) [violation of state law does not give rise to a constitutional violation]; Hovater v. Robinson, 1 F.3d 1063, 1068 n.4 (10th Cir. 1993) [failure to adhere to administrative regulations does not equate to a constitutional violation]; Riccio v. Cty. of Fairfax, 907 F.2d 1459, 1469 (4th Cir. 1990) [holding that state's failure to abide by its own procedural regulations is not a federal due process issue]; Sims v. Ulit, 2012 U.S. Dist. LEXIS 11068 at *23 (E.D.

Cal. Jan. 31, 2012) ["[A] prison official's mere violation of a prison regulation" does not constitute a constitutional violation].

In that same vein, merely negligent tactics are insufficient to establish a violation of the constitution. Billington v. Smith, 292 F.3d 1177, 1190 (9th Cir. 2002) *abrogated on other grounds by* County of Los Angeles v. Mendez, ___U.S.___ , 137 S. Ct. 1539, 198 L. Ed. 2d 52 (2017). "[A plaintiff] cannot 'establish a Fourth Amendment violation based merely on bad tactics that result in a deadly confrontation that could have been avoided.'" City & County of San Francisco v. Sheehan, 135 S. Ct. 1765, 1777, 191 L. Ed. 2d 856 (2015) *quoting* Billington, 292 F.3d at 1190. "Section 1983 imposes liability for violations of right protected by the Constitution, not for duties of care arising out of tort law. Remedy for the latter type of injury must be sought in state court under traditional tort-law principles." Baker v. McCollan, 443 U.S. 137, 146, 99 S. Ct. 2689, 61 L. Ed. 2d 433 (1979). For all these reasons, any evidence of policy violations, is irrelevant to the reasonableness of the force used against Decedent thus should be disregarded this Court.

## VIII. <u>CONCLUSION</u>

For all of the foregoing reasons, Defendant-Appellant Officer Concetti urges this Court to reverse the decision below and hold that Concetti is entitled to complete qualified immunity with regard to Plaintiff's Fourth Amendment claim.


DATED: January 10, 2023       Respectfully submitted,
                                    JONES & MAYER


                               By: <u>/s/ Denise L. Rocawich</u>
                                  James R. Touchstone
                                  Denise L. Rocawich
                                  Attorneys for Appellant Jonathan Concetti

## STATEMENT OF RELATED CASE

Pursuant to Circuit Rule 28-2.6, this case is related to case 22-55579 which is an appeal filed by Officer Concetti and Officer Azmy's co-defendants in the underlying district court case Defendants Daniel Antalek, City of Los Angeles, Miguel Lara, Michel Moore, Lawrence Parks, Antonio Robles, Blair A Spraggins. Appeal 22-55579 relates to the identical order on Motion for Summary Judgment at issue in this appeal.

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rules of Appellate Procedure, Rule 32(a)(7), the undersigned certifies that the accompanying brief:

(1)     Has been prepared using 14-point Times New Roman typeface;

(2)     Is double-spaced (except headings and footnotes);

(3)     Is proportionally spaced; and

(4)     Contains 9,616 words, exclusive of the tables of contents, table of authorities, signature lines, certificates of counsel, and the proof of service.

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on January 10, 2023.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Mary Kate Becerra